UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                  :     Civil Action No.

ARIEL NUNEZ                     :
                                  :
               Plaintiff,   :     **COMPLAINT AND**
                                  :     **JURY DEMAND**
     -v.-                     :
                                  :
BROOKHAVEN SCIENCE      :
ASSOCIATES, LLC,         :
                                :
               Defendant.  :
------------------------------------------------------X

Plaintiff ARIEL NUNEZ, by and through his attorneys, THE LAW OFFICES OF SHELDON KARASIK, P.C., as and for his Complaint against Defendant BROOKHAVEN SCIENCE ASSOCIATES, LLC, states as follows:

## THE PARTIES

1.      Plaintiff ARIEL NUNEZ is an individual residing in Suffolk County.

2.      Defendant BROOKHAVEN SCIENCE ASSOCIATES, LLC ("BSA") is a limited liability corporation maintaining its principal place of business at 2 Center Street, Upton, Suffolk County, NY 11973 (P.O. Box 5000, Upton, NY, 11973). BSA is a partnership between the Battelle Memorial Institute ("Battelle"), a corporation headquartered at 505 King Avenue, Columbus, OH 43201, and the Research Foundation for the State University of New York ("RFSUNY"), headquartered at 35 State Street, Albany, NY 12207 (P.O. Box 9, Albany, NY 12201).

3.      The Brookhaven National Laboratory ("BNL") is a Department of Energy ("DOE") facility located in Upton, New York. The BNL campus has approximately 1,200 DOE employees and contractors on-site. BNL operations, facilities, and personnel are overseen by Defendant, Brookhaven Science Associates, LLC, a federal contractor.

1

## JURISDICTION AND VENUE

4.      Jurisdiction in this Court is based upon 28 U.S.C. § 1331 as it involves a federal question pursuant to the Americans with Disabilities Act, 42 U.S.C. §12101 et seq. ("ADA").

5.      Venue lies in this federal judicial district pursuant to 28 U.S.C. §1391(b)(1) in that Defendant's primary place of business is in Suffolk County as provided in 28 U.S.C. §1391(d).

## BACKGROUND

6.      In August 2021, the U.S. Department of Energy ("DOE") issued an updated COVID-19 Workplace Safety Framework (the "DOE Framework"). The DOE Framework required Defendant to report to the DOE the percentage of its workforce that had been "vaccinated" (the "Vax Report"). Remote employees were to be included in this percentage.

7.      The DOE sent the Vax Report to the federal Office of Management and Budget ("OMB"), which relayed the numbers to the White House. The White House, in turn, tracked federal agencies in their progress toward maximal uptake of the state-sponsored shots. *See* White House Press Release (November 24)[1] and White House Press Release (December 9).[2]

8.      The DOE Framework *did not* require Defendant to make mandatory COVID-19 inoculation a condition of employment.

9.      In response to the reporting requirement in the DOE Framework, Defendant began implementation of its "COVID-19 Mandatory Vaccination Policy" (hereafter the "Inoculation Mandate") in September 2021. Unlike Defendant's previous policy, the Inoculation Mandate applied even to remote workers and individuals who did not need to set foot on the BNL campus.

---

[1] www.whitehouse.gov/omb/briefing-room/2021/11/24/update-on-implementation-of-covid-19-vaccination-requirement-for-federal-employees/

[2] www.whitehouse.gov/omb/briefing-room/2021/12/09/update-on-implementation-of-covid-%e2%81%a019-vaccination-requirement-for-federal-employees/

10.     The express goal of the Inoculation Mandate was to maximize the percentage of its workforce that could be reported as "fully vaccinated" as of December 31 (i.e., by end-of-year). The relevant decisionmakers believed that it was in their personal and professional best interest to achieve the highest possible percentage.

11.     In September 2021, Defendant enacted the "Inoculation Mandate," a mandatory vaccination policy for all BNL personnel, including federal employees, contractors, and subcontractors. This policy enacted a "requirement that all employees, including remote employees, must be vaccinated as a condition of employment, effective November 17, 2021."

12.     Defendant's Inoculation Mandate contemplated three options for BSA employees: (1) Submit to the "jab" (a single-shot or multiple-shot regimen of one of the Covid-19 "vaccines" that had been fast-tracked through the FDA approval process),[3] (2) Obtain an exemption for

---

[3] FDA approval is not dispositive of a treatment's safety for individuals. The agency has a public health mandate and therefore allows the use of Covid-19 treatments on the basis of public health despite "known and potential risks" to individuals, especially those susceptible to thrombosis or autoimmune disorders:

   a. Thrombosis: On April 13, 2021, two months after FDA approval, the agency recommended a pause in use of the J&J shot due to reports of serious side effects relating to thrombosis. The pause was lifted on April 23, 2021, on the basis that "the known and potential benefits of Janssen COVID-19 Vaccine outweighed its known and potential risks in individuals 18 years of age and older." FDA, *Coronavirus (COVID-19) Update*, supra. On May 5, 2022, a year after lifting the pause, the FDA rescinded general authorization for the J&J vaccine, acknowledging that it causes TTS and poses a serious health risk: "FDA has determined that the risk of thrombosis with thrombocytopenia syndrome (TTS), a syndrome of rare and potentially life-threatening blood clots in combination with low levels of blood platelets with onset of symptoms approximately one to two weeks following administration of the Janssen COVID-19 Vaccine, warrants limiting the authorized use of the vaccine." Id. This change was not precipitated by new data; in fact, the FDA acknowledged that "reporting rates of TTS and TTS deaths following administration of the Janssen COVID-19 Vaccine are not appreciably lower than previously reported." *Id*.

   b. Autoimmune Disorders: In July 2021, the FDA knew that the Johnson & Johnson shot caused Guillen-Barre Syndrome, an autoimmune neuropathy that is similar to Sjogren's and associated with other autoimmune conditions. *See* Michael Erman, *U.S. puts new warning on J&J coronavirus vaccine for autoimmune disorder* (Reuters, July 13, 2021) https://www.reuters.com/business/healthcare-pharmaceuticals/us-announce-new-warning-jj-coronavirus-vaccine-autoimmune-disorder-washington-2021-07-12/. Although the U.S. government made Johnson & Johnson put a label on its shots, it did not, however, pull the medication from the market. *Id.* Similar autoimmune issues have been found with the mRNA vaccines. Yue Chen Y, et al., *New-onset autoimmune phenomena post-COVID-19 vaccination*. Immunology. 2022 Apr; 165(4):386-401. doi: 10.1111/imm.13443. Epub 2022 Jan 7. PMID: 34957554.

Nor is CDC approval any better. *See* National Academy of Sciences, *CDC Recommendations* (1996) https://www.ncbi.nlm.nih.gov/books/NBK233067/ ("CDC is not a regulatory agency and has no regulatory

medical or religious reasons, or (3) Involuntarily "resign" (*ostensibly without severance or the right to file for unemployment*).

13.    To be effectively "validated" per the BSA policy ("inoculated"), employees were required to be "vaccinated with both shots of either the Pfizer/BioNTech or Moderna vaccines or the first and only shot of the Johnson & Johnson vaccine" and to "validate" (disclose) their inoculation status with BSA's Occupational Medicine Clinic ("OMC"). Employees were supposed to start the "vaccination" process by November 17, 2021, and to have completed a one- or two-dose regimen by December 17, 2021.

14.    In conjunction with the Inoculation Mandate, Defendant enacted a vaccination-status badge system. BSA personnel and visitors to the BNL campus were required to wear brightly colored identification badges. The organization offered blue badges for "Validated" (Covid-19-inoculated) individuals and orange badges to stigmatize non-"validated" individuals as

---

authority, even though it does have a public health mandate.") In fact, the CDC has an incentive to pursue nationwide public health policy even at the expense of individual patients. For example:

    a.   A causal relationship has long been observed between the mRNA inoculations, especially the Moderna shot, and myocarditis and pericarditis – especially in young people.

    b.   The correlation was significant enough that in 2021, many European countries banned the Moderna jab for those in younger age groups. *Fact Check - Some European countries halted Moderna COVID-19 vaccines for young people* (Reuters, October 18, 2021) https://www.reuters.com/article/factcheck-europe-moderna/fact-check-some-european-countries-halted-moderna-covid-19-vaccines-for-young-people-idUSL1N2RE22K; Robert Hart, *Germany, France Restrict Moderna's Covid Vaccine For Under-30s Over Rare Heart Risk—Despite Surging Cases*, (Forbes November 10, 2021) (Updated Apr 21, 2022) https://www.forbes.com/sites/roberthart/2021/11/10/germany-france-restrict-modernas-covid-vaccine-for-under-30s-over-rare-heart-risk-despite-surging-cases/?sh=557cb5032a8a.

    c.   The CDC did not suspend the shots; and although the CDC eventually acknowledged that myocarditis and pericarditis can be caused by the mRNA shots, but continued recommending the shots to all age groups. CDC, *Myocarditis and Pericarditis After mRNA COVID-19 Vaccination* (Updated Sept. 27, 2022) https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/myocarditis.html ("Should I Still Get Myself or My Child Vaccinated? Yes. CDC continues to recommend that everyone ages 6 months and older get vaccinated for COVID-19.")

Ultimately, neither FDA nor CDC approval are a valid substitute for a personalized medical consultation with one's primary care physician.

unhygienic, unclean hazards to public health. These "Validation Badges" were required at all times while on BNL grounds and determined whether employees and visitors were required to mask.

15.    Employees were told via email that Defendant would make "reasonable accommodations" available for personnel seeking to avoid the Pfizer/BioNTech, Moderna, and Johnson & Johnson injections on medical or religious grounds.

16.    BSA's Inoculation Mandate did not allow for N95 masking, remote work, or periodic testing as alternatives to the jab. Complete exemption, to be granted or denied at the discretion of BSA and its agents, was the only accommodation offered.

17.    Plaintiff Ariel Nunez ("Ariel) applied for a temporary medical exemption in order to complete a series of diagnostic appointments relating to the onset of autoimmune conditions (since diagnosed as Rheumatoid Arthritis and Sjogren's Syndrome) in addition to ongoing medical issues stemming from his inhalation of toxic particles and chemicals in the aftermath of 9/11 as a member of the NYPD. His request for a one-to-two-month deferral of his inoculation regimen was denied with a curt, generic explanation, resulting in his termination.

18.    Ariel Nunez was an engineer in the Electrical Engineering Group, where he worked on projects like the National Synchrotron Light Source II ("NSLS-II"), a machine that produces light beams that are 10,000,000,000 times brighter than the Sun. *See* https://www.bnl.gov/nsls2/about-nsls-ii.php.

19.    On September 11, 2001, as part of the deadliest ever terrorist attack on U.S. soil, two hijacked passenger planes struck the World Trade Center ("WTC") towers, destroying them. The explosions, fires, and collapsing WTC buildings created a massive and dense cloud of toxic dust, gases, and smoke that engulfed southern Manhattan and Brooklyn for months while a six-

story-high pile of rubble and jet fuel ("Ground Zero") continued to smolder. https://www.cdc.gov/wtc/exposures.html

20.     The toxic cloud that engulfed New York City included particles from cement, fiberglass, soot, lead paint, plastic, and partially burned jet fuel, which caused a health hazard for survivors and first responders. Among the hazardous substances later found within the cloud were lead, cadmium, chromium, magnesium, manganese, aluminum, titanium, barium, asbestos, polycyclic aromatic hydrocarbons (PAHs), and pesticides. *Id.* (citing P.J. Lioy, et al., *Characterization of the dust/smoke aerosol that settled east of the World Trade Center (WTC) in lower Manhattan after the collapse of the WTC 11 September 2001*, 110(7) Env. Health Perspective 703 (2002), https://doi.org/10.1289/ehp.02110703).

21.     In September 2001, Ariel Nunez was employed as executive officer of the capital construction unit of the New York Police Department.

22.     In the immediate aftermath of 9/11, Nunez joined the cleanup and recovery efforts at Ground Zero and in the surrounding area. In the months that followed, he was also dispatched to the Staten Island Landfill, where he assisted in the recovery and identification of victim remains. For month on end, he was exposed to toxic dust, gases, smoke, and debris.

23.     In the years that followed, Nunez (alongside many NYPD officers, first responders, workers, volunteers, and New York residents), developed health conditions as a result of his exposure to the toxic particles and chemicals emanating from the debris.

24.     Nunez has registered some of the more common WTC-related conditions under the WTC Health Program, a public health program set up for individuals suffering from health effects caused by WTC fallout and debris. He has registered health issues with the WTC Health Program (case numbers 0016534, 0192848 and 0192849) that have manifested as, *inter alia*:

    a.   Lung nodules;

    b.   Colon polyps (requiring removal in 2018 & 2022);

    c.   Rhinitis and chronic sinus issues;

    d.   Gastroesophageal reflux disease (GERD); and

    e.   Chronic health-related sleep deprivation.

25.    Nunez also has three conditions that are registered with the WTC Center of Excellence Medical Monitoring at Stonybrook but were not, at the time, registered under the WTC Health Program: Raynaud's Syndrome, Rheumatoid Arthritis (RA), Sjogren's Syndrome.

    a.   Raynaud's Syndrome or Raynaud's Phenomenon is a loss of blood flow (ischemia) to the extremities, resulting in numbness and loss of function. *See* SSDI 14.04. Ariel's Raynaud's symptoms initially manifested in his fingers and toes in 2019 and were diagnosed sometime thereafter, but began worsening and affecting his hands and feet in late 2020 and early 2021.

    b.   RA is an autoimmune disorder that causes inflammation and affects the joints and connective tissue. *See* SSDI 14.06 & 14.09. Nunez's RA symptoms gradually developed over the past several years. He was diagnosed in 2022.

    c.   Sjogren's Syndrome is an autoimmune condition affecting saliva production and eye lubrication, which can cause dry mouth, dry eyes (including vision issues), and chronic fatigue. *See* SSDI 14.10. The onset of Ariel's Sjogren's symptoms began in March 2021. He was diagnosed in 2022.

    d.   Raynaud's Syndrome, RA, and Sjogren's Syndrome are often interrelated conditions that coincide in individuals with broader systemic autoimmune disorders.

26. In October, November, and December 2022, Ariel's deteriorating health conditions were being investigated by his doctors. Although his RA and Sjogren's Syndrome diagnoses were not yet confirmed, the doctors suspected an autoimmune disorder. Because it would likely be detrimental to effective diagnosis of his autoimmune condition, Ariel's doctors recommended that he defer his COVID-19 inoculation series until after he was diagnosed.

    a. Raynaud's, Sjogren's, and RA are not automatically covered under the CDC's WTC Health Program or the affiliated VCF (Victim's Compensation Fund). To qualify for benefits, Nunez needed to submit petitions for review. For that, he needed to have multiple consultations with multiple specialists, as well as x-rays, sonograms, and blood work.

    b. Ariel had medical consultations with an ENT, endocrinologist, and rheumatologist regarding his autoimmune issues throughout 2021 and into 2022. This process took longer than usual because doctor appointments, blood work, and other medical services were difficult to schedule during the COVID-19 pandemic.

    c. Ariel's doctors advised him that the available COVID-19 inoculations would interfere with his symptomology and bloodwork, and would impede their ability to properly diagnose his conditions. Because of this, the medical professionals recommended "temporary deferment" of his COVID-19 inoculation.

27. After the autoimmune diagnoses were confirmed, Ariel's doctor placed him on a medical treatment regimen, on which he remains to this day.

## MEDICAL DEFERMENT REQUEST

28. On October 8, 2021, Ariel Nunez requested a temporary medical deferment from the COVID-19 Inoculation Mandate.

a. "I have some medical abnormalities, at this interval of my life, that preclude from receiving the COVID-19 vaccine, until at least further diagnosis of these ongoing conditions are clarified and determined not to impact my well being," he wrote.

b. "I am in the process of obtaining whatever documentation is possible, for the various medical abnormalities that preclude me from receiving the COVID-I9 vaccine, at least until diagnosis and prognosis of these conditions are found to be with-in a safe Non-contraindications to my wellbeing. In addition, in my younger years, after receiving an MMR injection, I had an allergic reaction and was treated with IV an Albuterol. And again, while employed by The Police Department, a recommendation for members to receive the hepatitis B (3-series inoculation) caused similar effects. The Department recommended to avoid the balance of the vaccination series."

c. "I also have three ongoing conditions, related to exposure to WTC event, that have compromise and continue to compromise my health. These are registered cases numbers 0016534, 0192848 and 0192849. … In addition, I have a severe case of Raynaud's accompanied by Sjogren's syndrome, which my health care provider opines is contributing to the salivary glands, in addition to joint inflammation and fatigue, which at this time, is not a monitored medical condition under the WTC Program."

d. "I respectfully request an accommodation," he concluded, "which is reasonable, to have the conditions diagnosed and determine impacts to my prolong health, as surely determine by all the ongoing studies and declining health of other WTC members. The appointment for a consultation with an ENT with gland

subspecialties is for October 29th, a Rheumatologist on November 4th, and an Endocrinologist on December 28th." (Due to scheduling issues, some of these appointments were ultimately pushed out until early 2022).

29.     On November 4, 2021, Ariel received an email from Al Reilly, Director of BNL's Occupational Medicine Clinic, denying his deferment request. "After review," the memorandum stated, "your request for exemption was denied. The rationale behind your request for exemption for the COVID vaccination requirement is not a medical contraindication based upon valid reasons, as enumerated by the Advisory Committee on Immunization Practices of the United States Public Health Service and guidance from the United States Centers for Disease Control."

    a.   The United States Public Health Service ("USPHS") is not a regulatory agency; it is a branch of the nation's uniformed services. Officers of the USPHS Commissioned Corps serve as physicians, nurses, dentists, veterinarians, scientists, engineers in other regulatory agencies. They report to the U.S. Surgeon General. www.usphs.gov/about-us. The USPHS does not have an "Advisory Committee on Immunization Practices" and does not promulgate information regarding Covid-19 inoculations.

    b.   The Centers for Disease Control and Prevention ("CDC") is not a regulatory agency and does not provide guidance on "valid reasons" for medical exemptions. Although part of the federal executive branch, the CDC and its subunits are not statutorily authorized to regulate primary care physicians and do not purport to be authorities in individualized medical care. www.cdc.gov/vaccines/acip/committee/charter.html. *See also* National Academy of Sciences, *CDC Recommendations* (1996)

https://www.ncbi.nlm.nih.gov/books/NBK233067/ ("CDC is not a regulatory agency and has no regulatory authority, even though it does have a public health mandate. Thus, the only way that CDC can exert influence is to build consensus.")

30.     On November 8, 2021, the Monday after Ariel's medical request was denied, he reached out to Joann Williams of BNL Human Resources to set up a time to discuss his accommodation request and to see "if a possible resolution can be identified."

31.     On November 9, 2021, Ariel wrote to Joann to further explain his situation. "The request submitted to OMC," he wrote, "was to provide a reasonable accommodation to delay the Covid-19 Vaccination, based on issues being monitored by the WTC Health Program and my family physician with respective appointment dates."

    a.  "In May of 2021," he continued, "during my yearly examination at WTC, I explained about additional symptoms and worsening of my Raynaud's, severe dry mouth (OTC-no longer viable) joint inflammation, digestive issues and fatigue. And since they only monitor conditions, they advised on speaking with my personal Doctor and if need be they were willing to provide referrals. In between my personal Doctor and WTC, referrals were provided for an ENT with a salivary gland specialty, a Rheumatologist and an Endocrinologist. The appointment dates were provided in my request to OMC."

    b.  "On October 29th, I was examined by an ENT, and his preliminary diagnosis was Sjogren's. He requested blood work, but felt there are other underlining issues and I should seek further specialty. I advised of the additional appointments and advised on this being the proper path. The Rheumatologist appointment, originally for

November 4th was cancelled by the practice and rescheduled for December 21st. The Endocrinologist is still scheduled for December 28th."

c. "Based on other medical procedures, as a result of impacts from WTC, I find that this request to be reasonable, based on preliminary examination by my Doctor and the ENT. Can you please inquire of BSA/BNL and OMC Dr. Rielly a consideration of a follow-up with my family doctor for review of the Medical Accommodation request form. I will then proceed to make an appointment."

32.     On November 10, Williams replied: "Thank you Ariel – as I mentioned, I will submit your inquiry into our follow up spreadsheet.  I do not need any additional information."

33.     Later that afternoon, Williams explained to Ariel's supervisors that "for Ariel, if he chooses not to get vaccinated, his resignation date will be 12/21."

34.     On November 24, 2021, Ariel supplemented his medical accommodation request with updated information and a doctor's note appended.

a. "As previously requested," Ariel wrote, "I continue to be under medical care for diagnosis of conditions that are impacting my wellbeing, as a result of documented World Trade Center exposure."

b. He attached a note his doctor, who wrote: "Presently under investigation for a likely autoimmune condition, which has not yet been defined. It is reasonable to defer vaccine until patient's medical problems better defined."

c. Ariel also reiterated that he is allergic to the ingredients in some vaccines, and that he was hospitalized after an allergic reaction to an MMR vaccine and had an adverse reaction to a Hepatitis series.

35.     In response to his medical deferment request, Ariel was advised by his superiors and BSA administrators to get "vaxxed" notwithstanding his doctors' explicit recommendations:

    a.  Ariel's direct supervisor urged him, numerous times, to just visit a medical practice that could "help with" Ariel's "vaccine status."

    b.  Ariel also spoke with BSA's Dr. Rielly to explain his situation and his pending medical appointments.

        i.  Without any knowledge of Ariel's medical conditions, Dr. Rielly instructed Ariel to take the Johnson & Johnson shot, suggesting that he "should have no issues" with the vaccine-vector shot.

        ii.  In fact, the J&J shot would have been the most dangerous of the three available shots. *See* Michael Erman, *U.S. puts new warning on J&J coronavirus vaccine for autoimmune disorder* (Reuters, July 13, 2021) https://www.reuters.com/business/healthcare-pharmaceuticals/us-announce-new-warning-jj-coronavirus-vaccine-autoimmune-disorder-washington-2021-07-12/; CDC, *Selected Adverse Events Reported after COVID-19 Vaccination* (Updated Dec. 21, 2022) www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/adverse-events.html

36.     On December 3, 2021, Dr. Rielly wrote Ariel:

Good Afternoon:

After reviewing the information you provided, we cannot conclude that it supports your request for a medical exemption. Accordingly, you will be required to follow the vaccination mandate deadlines as set forth in the

communications you have received, including the last one dated 12-2-21

should you desire, or resign on or by December 19, 2021.

Thank you,

Al

37.    Dr. Rielly again gave no basis for Defendant's denial of Ariel's request.

38.    Consequently, Ariel was forced from his position. Had his requested accommodation been granted, he would not have been terminated.

39.    As a result of his termination, Ariel suffered acute financial insecurity, severe emotional distress, and physical ailments. These issues compound and were compounded by his medical conditions.

**EEOC CHARGE**

40.    In the weeks following his termination, Ariel reached out to Defendant numerous times to determine the proper regulatory agency through which to lodge a discrimination complaint, to no avail. He was referred to Joan Marshall, Debra Lange, Betsy Hanson, and Joseph Lee, none of whom were willing or able to give him a straight answer regarding his right to sue.

41.    Ariel also reached out to the Equal Employment Opportunity Commission ("EEOC") by calling the listed phone number, 800-669-4000, and was told by the representative that the Office of Federal Contract Compliance Programs ("OFCCP") had jurisdiction over BNL and that EEOC did not. When Ariel attempted to file with the OFCCP via the online portal, however, his filing was not accepted due to the type of business.

42.    Ariel then contacted the EEOC in March and was directed to schedule an intake interview. The earliest available appointment was in late September. Through repeated calls and emails, he was able to secure an intake meeting with EEOC in July of 2022.

43.     On July 6, 2022, Ariel was contacted by an EEOC investigator, with whom he drew up a formal EEOC charge.

44.     On December 5, 2022, EEOC issued a "right to sue" letter to Ariel Nunez. This action is filed pursuant thereto.

## FIRST CAUSE OF ACTION
### Disability Discrimination – ADA

45.     Plaintiff repeats and re-alleges the foregoing allegations contained in the preceding paragraphs as if fully set forth herein.

46.     Ariel Nunez is protected by the Americans with Disabilities Act, 42 U.S.C. §12101 et seq. ("ADA") from disability discrimination in the workplace. The ADA specifically provides "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. §12101. It provides that "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. §12112.

47.     Defendant is a "covered entity" pursuant to 42 U.S.C. §12111 that is subject to ADA jurisdiction because it is an "employer" as defined by the ADA ("a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year").

48.     Plaintiff is "disabled" within the meaning of 42 U.S.C. §12102, which defines disability as (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.

a. Nunez has a number of health conditions brought on by his exposure to toxins at the World Trade Center site, including lung nodules, colon polyps, rhinitis and chronic sinus issues, gastroesophageal reflux disease (GERD), and chronic health-related sleep deprivation. The acuteness and severity of these conditions make them a disabling condition.

b. Nunez also suffered from autoimmune conditions that have been diagnosed as Raynaud's Syndrome, Rheumatoid Arthritis (RA), and Sjogren's Syndrome. These are disabling conditions in their own right.

   i. Raynaud's Syndrome or Raynaud's Phenomenon is a loss of blood flow (ischemia) to the extremities, resulting in numbness and loss of function. *See* SSDI 14.04.

   ii. RA is an autoimmune disorder that causes inflammation and affects the joints and connective tissue. *See* SSDI 14.06 & 14.09.

   iii. Sjogren's Syndrome is an autoimmune condition affecting saliva production and eye lubrication, which can cause dry mouth, dry eyes (including vision issues), and chronic fatigue. *See* SSDI 14.10.

49.    As a result of his disability, Ariel could not safely obtain "vaccinated" status because his condition, in conjunction with other health factors, made it dangerous and medically inadvisable for him to receive a Covid-19 inoculation.

a. Prompt and effective diagnosis of Ariel's autoimmune conditions required him to put off a covid-19 shot while he was being diagnosed.

16

b.  His other health conditions and past exposure to toxic materials put him at additional risk. The Pfizer, J&J, and Moderna shots were never tested for safety and efficacy on someone with Ariel's conditions.

c.  Ariel is also allergic to some vaccines. Another anaphylactic event, like the ones after his MMR and Hepatitis shots, would be particularly dangerous to someone with his conditions.

50.  Ariel was otherwise qualified to perform the essential functions of his job with or without a reasonable accommodation.

51.  Ariel suffered adverse action by being discharged from his employment due to his disability. Among other things, Defendant and its agents subjected him to terms and conditions of his employment that were different from those of persons without disabilities and which were intolerable and amounted to constructive discharge.

52.  Defendant failed to reasonably accommodate Ariel's disability, as required by law.

53.  Due to Defendant's willful violations of the ADA, Ariel was damaged and is entitled to recover compensatory damages, economic damages, damages for emotional distress, back and front pay, punitive damages, reasonable attorneys' fees and costs of the action, and pre- and post-judgment interest.

**WHEREFORE**, Plaintiff respectfully prays that this Court grant the following relief against Defendant:

A.  Enter judgment on the First Cause of Action declaring that Defendant has violated the anti-discrimination provisions of applicable law; declaring that Defendant's violations of the law were willful; enjoining future violations of the law by Defendant; ordering that Plaintiff be

reinstated to his former position; awarding Plaintiff front and back pay; awarding Plaintiff compensatory damages, including but not limited to damages for emotional pain and suffering; awarding Plaintiff punitive damages; awarding Plaintiff pre- and post-judgment interest; awarding Plaintiff reasonable attorneys' fees and costs; and awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 16, 2023

LAW OFFICES OF SHELDON KARASIK, P.C.
Attorneys for Plaintiff

By:_____/s/ *Sheldon Karasik*_____
Sheldon Karasik (SK-4020)
244 Fifth Avenue, Suite Q249
New York, NY 10001
Direct Dial: (917) 587-8153
Email: sheldon@karasiklawoffices.com